UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FREDDIE KNIGHT,

Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,

Defendant.[1]

**DECISION AND ORDER**

6:21-CV-6633 EAW

## INTRODUCTION

Plaintiff Freddie Knight brings this action alleging that the New York State Department of Corrections and Community Supervision ("DOCCS" or "Defendant") violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; and the Rehabilitation Act ("RA") of 1973, 29 U.S.C. § 794, when it failed to provide him corrective contact lenses. (Dkt. 10). Presently before the Court is Defendant's motion for summary judgment. (Dkt. 48). For the reasons explained below, Defendant's motion is granted.

[1] The complaint incorrectly identified the Defendant as the "Department of Correction and Community Services." (Dkt. 1). The Clerk of Court is directed to amend the caption as it appears above to correct this misnomer.

## PROCEDURAL HISTORY

Plaintiff filed his *pro se* complaint on October 13, 2021, against DOCCS and several DOCCS employees (Dkt. 1) and thereafter filed an amended complaint (Dkt. 10) on January 3, 2023. Upon screening the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), this Court permitted Plaintiff's ADA and RA claims for injunctive relief and his claim under the ADA for monetary damages against DOCCS to proceed to service but dismissed Plaintiff's 42 U.S.C. § 1983 claims against the remaining defendants with prejudice. (Dkt. 13). After a Scheduling Order was entered (Dkt. 23), Plaintiff moved for appointment of counsel (Dkt. 24), which the Court granted (Dkt. 25).

Upon completion of discovery, Defendant filed this motion for summary judgment. (Dkt. 48). Thereafter, Plaintiff filed his opposition (Dkt. 53), and Defendant replied (Dkt. 56).

## BACKGROUND

### I. Loc. R. Civ. P. 56(a)(2)

Before setting forth the factual background of this matter, the Court must resolve a threshold procedural issue. This District's Local Rules of Civil Procedure require that a party moving for summary judgment file a Statement of Undisputed Facts accompanied by citations to admissible evidence or to evidence that can be presented in admissible form at trial. *See* Loc. R. Civ. P. 56(a)(1). Correspondingly, Local Rule 56 requires a party opposing summary judgment to file a statement admitting or contesting the moving party's Statement of Undisputed Facts:

> A party opposing a motion for summary judgment shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by correspondingly numbered paragraphs in such opposing statement with citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A). In addition, when appropriate, the opposing party's statement may also contain a short and concise statement, in numbered paragraphs, of additional material facts (i) as to which the opposing party contends there is no genuine issue to be tried; and/or (ii) that the opposing party contends are in dispute.

Loc. R. Civ. P. 56(a)(2).

Here, Defendant submitted a "Statement of Material Facts Not in Dispute" in support of its motion. (Dkt. 48-1). But Plaintiff failed to comply with the Local Rule. Instead, Plaintiff included his own "Counterstatement of Material Facts Not in Dispute," which sets forth his version of the relevant events but fails to directly respond to Defendant's Statement of Material Facts Not in Dispute. (Dkt. 53-2).

Where, as here, a party violates a district court's local rules, the Court has discretion to deem facts admitted. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005). But a district court should not deem unopposed facts to be admitted when those facts are unsupported by the record. *Id.* at 649. Accordingly, the Court accepts as true the facts set forth in Defendant's Statement of Material Facts "to the extent they are supported by admissible evidence in the record and are not directly controverted by the facts and exhibits in the record." *Popat v. Levy*, No. 15-CV-01052 EAW, 2024 WL 3652947, at *2 (W.D.N.Y. Aug. 5, 2024). The following

facts are taken from Defendant's Statement of Material Facts (Dkt. 48-1), Plaintiff's Counterstatement of Material Facts (Dkt. 53-2), and the exhibits submitted by the parties.

## II. Factual Background

Plaintiff was incarcerated in DOCCS's custody from 2018 to 2024. (Dkt. 48-1 at ¶ 1; Dkt. 53-2 at ¶ 2). Plaintiff suffers from an eye disease called keratoconus—the progressive misshaping of the cornea which causes vision distortion and loss. (Dkt. 48-1 at ¶ 4; Dkt 48-3 at ¶ 4; Dkt. 53-2 at ¶ 7).

Before Plaintiff was transferred into DOCCS custody, he was incarcerated at Riker's Island, where he was issued contact lenses for his condition. (Dkt. 48-1 at ¶¶ 4, 7-9; Dkt. 53-2 at ¶¶ 7-9). Doctors told Plaintiff the contact lenses were necessary to treat the keratoconus and prevent cataracts. (Dkt. 48-2 at 76, 159-61, 221-22).

On November 9, 2018, Plaintiff was transferred from Riker's Island into DOCCS custody at Downstate Correctional Facility ("Downstate"). (Dkt. 48-1 at ¶ 10; Dkt. 48-2 at 72-73). During intake, Plaintiff's contact lenses were confiscated. (Dkt. 48-1 at ¶ 11; Dkt. 53-2 at ¶¶ 10-11). He was allowed to keep his glasses (Dkt. 48-1 at ¶ 11), but his glasses did not "make [his] vision better." (Dkt. 48-2 at 96, 144 (glasses "wouldn't help")). Plaintiff requested to see an ophthalmologist "ASAP" to replace his confiscated contact lenses. (*Id.* at 98). Plaintiff had an appointment with an ophthalmologist several weeks later and was told by the ophthalmologist that contacts were ordered for him and he would receive them at his next facility. (Dkt. 48-1 at ¶ 11; Dkt. 48-2 at 102-03; Dkt. 53-2 at ¶ 11).

But when Plaintiff was transferred to Riverview Correctional Facility ("Riverview") on January 25, 2019, he did not receive his contact lenses. (Dkt. 48-1 at ¶ 13; Dkt. 48-2 at 71; Dkt. 53-2 at ¶ 13). At Riverview, Plaintiff was a patient of Dr. Michael Seidman, M.D. ("Dr. Seidman"). (Dkt. 53-2 at ¶ 13). Dr. Seidman believed that contact lenses would aid in correcting Plaintiff's vision, not for treating keratoconus. (Dkt. 48-1 at ¶ 15; Dkt. 48-3 at 8).

Plaintiff acknowledges that Dr. Seidman "prescribed and attempted to assist Plaintiff in obtaining the [contact lenses] that accommodate his condition," and that the "medical office at Riverview made an ongoing effort during Plaintiff's residency there to acquire contact lenses for him." (Dkt. 53-2 at ¶¶ 13-14).

However, DOCCS's optometry personnel lacked the proper equipment to fit Plaintiff with the specific and uncommon type of contact lenses he needed—that is, hard gas permeable contacts. (Dkt. 48-1 at ¶¶ 16, 19). So, Dr. Seidman scheduled an appointment for Plaintiff to be fit for contact lenses with an ophthalmologist outside of DOCCS. (*Id.* at ¶ 17).

According to Dr. Seidman, appointments with external medical facilities require approvals beyond the facility level, which can delay the scheduling of appointments. (*Id.* at ¶ 18). Additionally, when an inmate transfers to a new facility "outside of his 'hub' of facilities, pending appointments must be rescheduled." (*Id.*). The uncommon nature of the contact lenses Plaintiff required further hampered Dr. Seidman's ability to acquire the necessary contact lenses. (*Id.* at ¶ 19).

In the meantime, Plaintiff requested a reasonable accommodation. (Dkt. 48-3 at 10). In response to that request, Plaintiff and Dr. Seidman agreed in September 2019 that a magnifier would be a sufficient accommodation to allow Plaintiff to perform all activities of daily living. (Dkt. 48-1 at ¶ 20; Dkt. 48-3 at 10 ("[W]e both agree that [he] really only needs a magnifier. With that he has functional visual acuity for [activities of daily living].")). At some point during his confinement at Riverview, Plaintiff was also given a "sight guide"—another inmate who assists those with vision impairments to move around the facility. (Dkt. 48-2 at 146; 53-2 at ¶ 21).[2]

In October 2019, Plaintiff was transferred to Wyoming Correctional Facility ("Wyoming"). (Dkt. 48-1 at ¶ 21; Dkt. 48-2 at 71; Dkt. 53-2 at ¶ 18). At Wyoming, as at other DOCCS facilities, inmates could request specific accommodations for their disabilities. (Dkt. 48-1 at ¶ 22). With help from Wyoming's accommodation staff, Plaintiff requested numerous accommodations for his vision impairment including large print materials, magnifiers, a digital book player and books on tape, a lamp, sunglasses, a tactile combination lock, a talking watch, a talking calculator, and visual-impaired stationary. (*Id.* at ¶¶ 23-24; Dkt. 53-2 at ¶ 19). Plaintiff was also granted a sight guide at Wyoming. (Dkt. 48-2 at 146-47; Dkt. 53-2 at ¶ 21).

---

[2] Defendant's Statement of Material Facts Not in Dispute states that Plaintiff had a sight guide "available to him during the entirety of his tenure at DOCCS." (Dkt. 48-1 at ¶ 26). This, however, is not supported by Plaintiff's deposition testimony, which is more reasonably interpreted as stating that he first received a sight guide at Riverview and continued to have a sight guide for the duration of his DOCCS incarceration. (Dkt. 48-2 at 146-47).

All of Plaintiff's requests for accommodations at Wyoming were granted, and those accommodations were renewed in 2021. (Dkt. 48-1 at ¶ 25; Dkt. 48-2 at 267-73). Plaintiff expressed satisfaction with the accommodations he received at Wyoming. (Dkt. 48-1 at ¶ 27).

Plaintiff, however, filed multiple grievances against the Wyoming medical staff concerning the status of his contact lenses. (*Id.* at ¶¶ 28-30; Dkt. 53-2 at ¶¶ 23-25). In these grievances, Plaintiff complained that the delay in obtaining contact lenses amounted to a "deprivation of adequate medical care." (Dkt. 48-2 at 221 (capitalization omitted)). He also complained that he was "unable to see" (*id.* at 225) and believed that the delay in receiving contact lenses caused him to develop cataracts (*id.* at 222 ("As a result of a two-year deprivation of corrective lenses, [Plaintiff] now suffers with cataracts, continuous headaches, dizzy spells, sporadic neurological pain . . . and the eminent possibility of the permanent loss of his vision"), 249). Wyoming staff acknowledged Plaintiff's grievances but explained that his doctor's appointments were delayed because of the COVID-19 pandemic. (Dkt. 48-1 at ¶¶ 31-32; Dkt. 48-2 at 232, 236-38, 258-59; Dkt. 53-2 at ¶ 27).

By the fall of 2021, Plaintiff had been provided contact lenses. (Dkt. 48-1 at ¶¶ 33-34; Dkt. 53-2 at ¶¶ 28-29).[3] At that time, he was classified as having a "[s]evere [v]isual

[3] Plaintiff's medical records support that Plaintiff was using contact lenses in the fall of 2021, but Plaintiff's testimony seems to offer a different timetable. (Dkt. 48-4 at 4-5). Plaintiff testified that in May 2021, he received one contact lens because the ophthalmologist dropped the other contact lens and could not find it. (Dkt. 48-2 at 135, 137-39). Plaintiff was unable to use the single lens and first received a full set of contact lenses when he was later transferred to Woodborne. (*Id.* at 139, 142). Despite these

[i]mpairment." (Dkt. 48-2 at 272). In February 2022, Plaintiff was transferred to Hale Creek Alcohol and Substance Abuse Treatment Correctional Annex, and shortly after was transferred to Woodbourne Correctional Facility ("Woodbourne"). (Dkt. 48-1 at ¶¶ 35-36; Dkt. 53-2 at ¶¶ 29-30).[4]

By April 2022, Plaintiff was classified as "[l]egally [b]lind." (Dkt. 48-2 at 273). At Woodbourne, Plaintiff was granted accommodations similar to those he had at Wyoming, including large print, a digital book reader, a lamp, a visor and sunglasses, and other talking equipment. (Dkt. 48-1 at ¶ 37; Dkt. 48-2 at 273). And once again at Woodbourne, Plaintiff was never denied a requested accommodation. (Dkt. 48-1 at ¶ 38; Dkt. 48-2 at 158; Dkt. 53-2 at ¶ 31). Plaintiff continued to receive a number of visual impairment accommodations even after receiving his contact lenses. (Dkt. 48-2 at 273 (April 2022 approval for large print, "[m]obility [a]ssistants/[s]ighted [g]uide," "digital book reader," lamp, "visor/sunglasses for indoor use," and other "talking equip[ment]")).

---

inconsistencies, Plaintiff acknowledges in his Counterstatement of Material Facts Not in Dispute that he received contact lenses in fall of 2021. (Dkt. 53-2 at ¶ 28).

[4] Defendant attaches its Directive for "Incarcerated Individuals with Sensorial Disabilities" (Directive #2612) effective February 15, 2023, which indicates that inmates with severe visual impairments or legal blindness "shall be referred to . . . [a] designated facilit[y] which can accommodate their needs." (Dkt. 48-6 at 9). Both Woodbourne and Wyoming are identified as such facilities. (*Id.* at 10). Plaintiff makes no argument that he should have been initially transferred to one of these facilities, nor is it evident if the Directive in effect at the time of Plaintiff's entry into DOCCS's custody had a similar requirement.

With the sight guide, Plaintiff was able to access all necessary areas of the facilities including the medical areas and mess hall. (Dkt. 48-1 at ¶ 40; Dkt. 48-2 at 146; Dkt. 53-2 at ¶ 33). And throughout his time in DOCCS custody, Plaintiff was able to participate in mandated programing including anger management and substance abuse. (Dkt. 48-1 at ¶ 41; Dkt. 53-2 at ¶ 34). He was also preparing to get a G.E.D. (Dkt. 48-2 at 145). Plaintiff also participated in agriculture programming because it was not as reliant on vision. (*Id.* at 145-46).

Throughout his incarceration, Plaintiff was unable to participate in recreation, which he attributes to his inability to see, rather than the lack of contact lenses. (*Id.* at 146). Plaintiff was released from DOCCS custody on January 2, 2024. (Dkt. 48-1 at ¶ 36; Dkt. 53-2 at ¶ 30).

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the non-moving party, the Court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation modified). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II. Injunctive Relief

Defendant argues that because Plaintiff was released from DOCCS custody in January 2024, his claims for injunctive relief under the ADA and RA are moot and

summary judgment must be granted on those claims. (Dkt. 48-7 at 7-8). Plaintiff agrees that those claims are now moot. (Dkt. 53-1 at 11). Therefore, the Court grants Defendant's motion for summary judgment on Plaintiff's claims for injunctive relief under the ADA and RA.

**III. ADA Claim**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

"[I]n cases involving reasonable accommodations in the prison context, courts . . . employ 'the well-established ADA . . . burden shifting framework.'" *Kramer v. Dep't of Corr.*, No. 3:15-CV-00251 (RNC), 2019 WL 4805152, at *12 (D. Conn. Sept. 30, 2019) (quoting W*right v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016)), *aff'd*, 828 F. App'x 78 (2d Cir. 2020). To establish a prima facie violation under the ADA, Plaintiff "must show that 1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability." *Wright*, 831 F.3d at 72; *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("services, programs, or activities" include "recreational 'activities,' medical 'services,' and educational and vocational 'programs'"). "In order 'to assure meaningful access, reasonable accommodations in the programs or

benefits may have to be made.'" *Id.* (brackets omitted) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).

Defendant's motion only challenges whether Plaintiff has established a prima facie violation. (Dkt. 48-7 at 9). Specifically, it does not contest that Plaintiff is a qualified individual with a disability or that DOCCS is subject to the ADA. (Dkt. 48-7 at 14-16). Therefore, the dispute lies only within the last element—whether Plaintiff was denied the opportunity to participate in or benefit from DOCCS's services, programs, or activities, or was otherwise discriminated against by Defendant, by reason of his disability. "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks and citation omitted); *accord Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016).

In screening the amended complaint, the Court found that Plaintiff had "plausibly alleged a claim under the reasonable accommodation theory." (Dkt. 13 at 10). But since Defendant also appears to address the claim under an intentional discrimination theory, (Dkt. 48-7 at 17-19), the Court addresses both theories.

**A. Reasonable Accommodation**

"The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled[.]" *Felix v. N.Y.C. Transit Auth.*, 324 F.3d 102, 107 (2d Cir. 2003) (citing *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397

(2002)). "Under Title II, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual 'to have access to and take a meaningful part in public services and public accommodations.'" *Alston v. N.Y.C Dep't of Corr.*, No. 24 CIV. 6444 (NRB), 2026 WL 752925, at *6 (S.D.N.Y. Mar. 17, 2026) (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004)). Reasonable accommodation claims fall in two primary categories: "the outright denial of" or a delay in providing a reasonable accommodation. *Franks v. Eckert*, No. 18-CV-589 EAW, 2020 WL 4194137, at *4 (W.D.N.Y. July 21, 2020).

Because there is no dispute that Plaintiff ultimately received contact lenses, the accommodation he sought, this case falls into the latter category. Defendant argues that "notwithstanding any delay in the issuance of contact lenses, Plaintiff received numerous other reasonable accommodations [in the interim] that permitted him to participate in prison life as required by Title II, and his claim is effectively one for medical negligence, not failure to accommodate." (Dkt. 48-7 at 3). Plaintiff's opposition rests on the narrow theory that he required contact lenses to "equitably access all of [DOCCS's] programs[,]" and that DOCCS unreasonably delayed that accommodation for approximately three years. (Dkt. 53-1 at 16).

A delay in providing reasonable accommodations "can violate the ADA, if th[e] delay is caused by discriminatory animus and is sufficiently lengthy to constitute a constructive denial of a reasonable accommodation." *Franks*, 2020 WL 4194137, at *4 (quoting *Wenc v. New London Bd. of Educ.*, No. 3:14-CV-0840 (VAB), 2016 WL 4410061,

at *12 (D. Conn. Aug. 16, 2016), *aff'd*, 702 F. App'x 27 (2d Cir. 2017)). "The Second Circuit has 'consistently held that a plaintiff is required to provide evidence that the delay was motivated by the defendant's discriminatory intent, as opposed to mere negligence.'" *Ashcroft v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 575 F. Supp. 3d 418, 425 n.5 (W.D.N.Y. 2021) (brackets omitted) (quoting *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 260 (S.D.N.Y. 2015)). Consequently, while an "'unreasonable delay itself might be evidence of discriminatory intent[,]' . . . courts should also consider 'whether the delay was caused by the defendant's unreasonableness, unwillingness to grant the requested accommodation, or bad faith, as opposed to mere bureaucratic incompetence or other comparatively benign reasons." *Thompson v. Rushford*, No. 9:22-CV-0289(TJM)(CFH), 2023 WL 10365042, at *7 (N.D.N.Y. Dec. 15, 2023) (quoting *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 271 (S.D.N.Y. 2014)), *report and recommendation adopted sub nom. Thompson v. N.Y. State Corr. & Cmty. Supervision*, 2024 WL 580064 (N.D.N.Y. Feb. 13, 2024).

In determining whether Plaintiff experienced a constructive denial, the Court must initially determine the period of delay in receiving reasonable accommodations—*i.e.*, was Plaintiff first accommodated when he received contact lenses or did he receive reasonable accommodations at an earlier date. *See A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012) ("[W]hen an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or

not, need be provided by the grantee."), *aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013).

In the prison context, "[a] reasonable accommodation must provide effective access to prison activities and programs. That is, the accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities." *Wright*, 831 F.3d at 73 (internal citation omitted) (citing *Celeste v. E. Meadow Union Free Sch. Dist.*, 373 F. App'x. 85, 88 (2d Cir. 2010)). "An accommodation is not plainly reasonable if it is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him." *Id.* (citing *Disabled in Action v. Bd of Elections in City of N. Y.*, 752 F.3d 189, 200 (2d Cir. 2014)).

Determining "what constitutes a reasonable accommodation under the ADA requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 165 (2d Cir. 2013) (quotation marks and citations omitted). "[T]he 'hallmark of a reasonable accommodation is effectiveness[.]'" *Hamilton v. Westchester County*, 3 F.4th 86, 91 (2d Cir. 2021) (quoting *Wright*, 831 F.3d at 72). In other words, "a reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective." *Id.* (quoting *Wright*, 831 F.3d at 72).

As a "fact-specific question[,]" determining the reasonableness of an accommodation "often must be resolved by a factfinder." *Wright*, 831 F.3d at 72-73

(quotation marks and citation omitted). Nevertheless, a defendant is entitled to summary judgment where "the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." *Id.* at 73 (quotation marks and citations omitted).

Because the accommodations provided to Plaintiff changed over the course of his DOCCS incarceration—from his entry in November 2018 until he received contact lenses in the fall of 2021—the Court will examine these periods separately.[5]

**1. *Wyoming: October 2019 to Fall 2021*[6]**

Upon Plaintiff's transfer to Wyoming in October 2019, he requested and was provided with a variety of vision-related accommodations, including large print materials, magnifiers, a digital book player and books on tape, a lamp, sunglasses, a tactile combination lock, a talking watch, talking calculator, and visual-impaired stationery. (Dkt. 48-1 at ¶¶ 22, 24; Dkt. 48-2 at 267-73; Dkt. 48-6 at ¶¶ 7-8). Plaintiff was also given a sight guide to help him move around the facilities. (Dkt. 48-1 at ¶ 26; Dkt. 53-2 at ¶ 21). There was no accommodation that Plaintiff requested that he did not receive. (Dkt. 48-1 at ¶ 27).

While Plaintiff now characterizes his contact lenses as a reasonable accommodation, his grievances at Wyoming did not. Instead, his complaints concerned inadequate medical

---

[5] There is also some evidence in the record that Plaintiff's vision deteriorated over the period of his DOCCS confinement, which may explain the change in accommodations required. *Compare* (Dkt. 48-2 at 272 (classifying Plaintiff with a "[s]evere [v]isual [i]mpairment")) *with* (*id.* at 273 (classifying Plaintiff five months later as "[l]egally [b]lind)).

[6] Because Plaintiff received contact lenses while at Wyoming and maintained his contact lenses thereafter, it is unnecessary to evaluate his confinement after that point.

care—specifically, that the lack of contact lenses caused him to develop cataracts and other ailments. (Dkt. 48-2 at 221-22, 233-34). But "dissatisfaction with the [medical] care provided does not suffice to support [a plaintiff's] claim that he has been deprived of an opportunity to benefit from or participate in DOC[CS]'s services and programs." *Goode v. Morris*, No. 3:22-CV-1016 (VAB), 2023 WL 6371067, at *3 (D. Conn. Sept. 1, 2023) (citing *Tardif v. City of New York*, 991 F.3d 394, 405-06 (2d Cir. 2021)).

Even assuming that Plaintiff's contact lenses were considered an accommodation by Wyoming staff,[7] the alternative accommodations Plaintiff did receive were facially reasonable, and Plaintiff fails to identify any specific services, programs, or activities that Wyoming offers to inmates that he was excluded from or denied meaningful access to because of DOCCS's failure to accommodate his disability with contact lenses. *See Kearney v. Adams*, No. 9:15-CV-824(GLS)(CFH), 2018 WL 3121618, at *9-10 (N.D.N.Y. Feb. 8, 2018) (granting summary judgment where plaintiff was provided with alternative accommodations and failed "to identify any programs or services that he was excluded from because of DOCCS'[s] alleged failure to accommodate his disability"), *report and recommendation adopted*, 2018 WL 1470579 (N.D.N.Y. Mar. 26, 2018); *see also Disabled in Action*, 752 F.3d at 198-99 (to maintain claims under Title II of the ADA, "plaintiffs must show that [the defendant] has failed to provide them with meaningful access to the

---

[7] DOCCS's Directive #2612 that Defendant relies upon recognizes the "[a]cquisition . . . of . . . devices" as a possible reasonable accommodation. (Dkt. 48-6 at 7).

benefit that it offers" (citation modified)); *Martinez v. Cuomo*, 459 F. Supp. 3d 517, 523 (S.D.N.Y. 2020) (to sustain claims under the ADA, a plaintiff "must . . . show that the public entity has failed to institute reasonable accommodations sufficient to provide them with 'meaningful access' to the services" (quoting *Disabled in Action*, 752 F.3d at 199)).

Indeed, Plaintiff acknowledges that he could "move[] through different portions of his facilities, such as medical and the mess hall" and that he "was able to complete mandated programing while in DOCCS custody, including anger management, substance abuse programming, and agriculture." (Dkt. 53-2 at ¶¶ 33-34). And while Plaintiff testified that he was not able to participate in recreation, he did not attribute that inability to the denial of contact lenses—the only accommodation he alleges that he was denied. (Dkt. 48-2 at 146).[8]

The lone deficiency Plaintiff points to in the alternative accommodations he received relates to the use of sight guides. According to Plaintiff, the sight guides failed to afford him the "dignity" and "independence" that contact lenses—and the ability to walk without a guide by his side—would have provided. (Dkt. 53-1 at 16). But Plaintiff offers

[8] Plaintiff testified that it was his general inability to see, rather than the lack of contact lenses specifically, that prohibited him from participating in recreation. (Dkt. 48-2 at 146). He does not identify this as an activity that he did not have access to without a reasonable accommodation. Instead, it appears that he lacked the vision necessary to participate in recreation with or without a reasonable accommodation. *See McElwee v. County of Orange*, 700 F.3d 635, 643 (2d Cir. 2012) ("[A]n individual is qualified to participate in a program if he meets the essential eligibility requirements for participation in the program, with or without reasonable accommodations." (citing 42 U.S.C. § 12131(2)).

no evidence that the sight guide was deficient in providing him access to the facilities. *See Ashcroft*, 575 F. Supp. 3d at 426 (explaining that there was "no evidence" that plaintiff, who was similarly legally blind due to keratoconus, "was inhibited from moving around the facility with the escorts that were provided"); *cf. Wright*, 831 F.3d at 73 (reversing grant of summary judgment where there was "evidence that indicate[d] the mobility assistance program fail[ed] to allow [plaintiff] to move freely throughout the DOCCS facility and discourage[d] his participation in prison activities"). While Plaintiff claims in his Counterstatement of Material Facts Not in Dispute that sight guides "are not always available[,]" the portions of his deposition transcript he cites to in support of that factual assertion fail to support that claim. (Dkt. 53-2 at ¶ 21 (citing Dkt. 48-2 at 146-49)).[9]

Even after Plaintiff received contact lenses in 2021, he continued to request and receive many of the same vision accommodations he previously received when he was without contact lenses. (Dkt. 48-2 at 146-47, 273). This underscores that contact lenses did not afford him meaningful access to prison activities, programs, and services. Rather, it was the other accommodations that did so.

In other words, the alternative accommodations Defendant provided for Plaintiff's sight impairment—even though not the accommodation he preferred—were plainly reasonable, and Plaintiff has failed to offer any evidence from which a reasonable jury could conclude that the denial of contact lenses inhibited him from meaningfully accessing

[9] Plaintiff cites to the page numbers of his deposition transcript (119-22), rather than the CM/ECF pagination.

the programs, activities, and services at Wyoming. *See McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("Although a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice." (citing *Fink v. N.Y.C. Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995)); *Lopez v. Fischer*, No. 07-CV-0365, 2011 WL 1233107, at *8 (W.D.N.Y. Mar. 30, 2011) ("While the plaintiff must be accommodated so that he can participate in and benefit from the programs available to a non-impaired . . . inmate, he does not have the right to choose how he is to be accommodated in that regard."), *aff'd sub nom., Lopez v. Kirkpatrick*, 505 F. App'x 58 (2d Cir. 2012); *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) ("As long as Defendants reasonably accommodated [the plaintiff's] disability, they need not provide him with the exact accommodations he demanded." (original brackets and citation omitted)).

### 2. *Downstate/Riverview: November 2018 to October 2019*

Unsurprisingly, Defendant focuses heavily on the accommodations provided to Plaintiff at Wyoming and Woodbourne. (Dkt. 48-7 at 16). The accommodations Plaintiff received at Riverview were limited to a sight guide at some point and later a magnifier shortly before his transfer to Wyoming. (Dkt. 48-2 at 146; Dkt. 48-3 at ¶ 7). While those accommodations were less than those provided to Plaintiff at Wyoming, Plaintiff acknowledges that he was able—through the use of a sight guide—"to move through different portions of his facilities" and was also able to "complete mandated programming

while in DOCCS custody." (Dkt. 48-2 at 146; Dkt. 53-2 at ¶¶ 33, 34). And he does not identify evidence or offer an affidavit (or declaration) disputing Dr. Seidman's Declaration and contemporaneous Ambulatory Health Record that, in September 2019, the only accommodation he needed to perform his "activities of daily living" was a magnifier, which was provided. (Dkt. 48-1 at ¶ 20; Dkt. 48-3 at 10).

Yet, giving Plaintiff every favorable inference, the fact that he received a number of additional vision-related accommodations when he arrived at Wyoming just a month later, suggests that the earlier accommodations he received at Riverview were not plainly reasonable—*i.e.*, effective at providing him meaningful access. Both parties are also silent as to Plaintiff's approximately 77-day incarceration at Downstate from November 9, 2018 to January 25, 2019, where he appears to have received no accommodations. Even without a request for an accommodation, once Plaintiff was seen by the ophthalmologist at Downstate, Plaintiff's vision issue and the need for contact lenses or some alternative vision accommodation should have been apparent. *See Matchett v. Brighton Police Dep't*, No. 24-CV-6001-FPG, 2024 WL 4607728, at *2 (W.D.N.Y. Oct. 29, 2024) ("[E]ven without a request, a public entity has a duty to reasonably accommodate a disability 'if the disability is obvious'—that is, if the entity 'knew or reasonably should have known that the plaintiff was disabled.'" (brackets and footnote omitted) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008))).

Thus, there are questions of fact as to whether Plaintiff was reasonably accommodated prior to his arrival at Wyoming. The approximately 11-month period

between Plaintiff's transfer into DOCCS custody at Downstate to his arrival at Wyoming is sufficiently lengthy for a reasonable fact finder to conclude that Plaintiff experienced a constructive denial. *See Logan*, 57 F. Supp. 3d at 271 ("[U]nder some circumstances, courts have found plaintiffs' requests for reasonable accommodations to have been constructively denied after delays approximating four months.").

Giving Plaintiff every favorable inference, the unexplained confiscation of his contact lenses, the preferred accommodation previously provided to Plaintiff at another correctional facility, followed by an approximately 11-month period during which DOCCS failed to provide any alternative accommodations to Plaintiff while housed at Downstate or to provide plainly reasonable alternative accommodations while he was housed at Riverview, particularly when contrasted with the panoply of accommodations he received upon his transfer to Wyoming, constitutes sufficient evidence from which a reasonable fact finder could conclude that the delay in affording reasonable accommodations to Plaintiff was attributable to more than "mere bureaucratic incompetence or other comparatively benign reasons." *See Thompson*, 2023 WL 10365042, at *7 (citation omitted) (denying summary judgment where the defendant offered no explanation for the delay in acting on plaintiff's reasonable accommodation request until he was transferred to another facility).

Therefore, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's ADA claim based on a reasonable accommodation theory arising from this confinement at Wyoming until his release from DOCCS's custody. There are otherwise triable issues of fact as to whether Plaintiff was reasonably accommodated while housed at

Downstate and Riverview, and whether the delay in providing reasonable accommodations violated the ADA.

**B. Intentional Discrimination (Disparate Treatment)**

Defendant characterizes Plaintiff as attempting to "back-door" his dismissed deliberate indifference claim into a disparate treatment claim and moves to dismiss that claim. (Dkt. 48-7 at 17, 19 (arguing that Plaintiff "does not point to evidence that he received different treatment because of his disability: that is, that other, non-disabled inmates were better able to access medical services and treatment than he")). The Court permitted Plaintiff's ADA claim to proceed on a reasonable accommodation theory. (Dkt. 13 at 10 (finding that Plaintiff "plausibly alleged a claim under the reasonable accommodation theory")). It also found that that the amended complaint did "not allege facts . . . [to] reasonably infer that DOCCS . . . acted with deliberate indifference to his disability in failing to replace his corrective lenses. . . ." (*Id.* at 11). In any event, even if such a claim remained in the case, it would fail.

Notably, the ADA does not apply "to claims regarding the adequacy or substance of medical services provided by correctional departments," nor does it "provide[ ] a remedy for medical malpractice." *Silva v. Robleoo*, No. 3:22CV29 (MPS), 2023 WL 184240, at *3 (D. Conn. Jan. 13, 2023). To establish an ADA claim based on the denial of medical care, there must be evidence "that the adverse treatment was by reason of the prisoner's disability." *Rosado v. Semple*, No. 3:20-CV-1908 (JAM), 2022 WL 673275, at *4 (D. Conn. Mar. 6, 2022) (citation omitted). Consequently, "[c]ourts routinely dismiss ADA

suits by disabled inmates that allege inadequate medical treatment, but do not allege that the inmate was treated differently because of his or her disability." *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010).

Nothing in the record suggests that Plaintiff was denied contact lenses because of his disability. Therefore, any ADA claim based on a theory of intentional discrimination is dismissed.

## IV. Sovereign Immunity

Alternatively, Defendant argues that Plaintiff's claim for monetary damages under the ADA is barred by sovereign immunity. (Dkt. 48-7 at 8-14).[10]

"Congress has unambiguously purported to abrogate states' immunity from Title II claims." *T.W. v. N.Y. State Bd. of L. Exam'rs*, 110 F.4th 71, 81 (2d Cir. 2024) (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir. 2010)), *cert. denied*, 145 S. Ct. 2700, 221 L. Ed. 2d 966 (2025). Under Section 5 of the Fourteenth Amendment, Congress has "the authority to abrogate states' immunity as to conduct that actually violates the Fourteenth Amendment, as well as a somewhat broader swath of conduct that is constitutional but

---

10 The Court recognizes that "[i]ssues of federal sovereign immunity implicate a court's subject-matter jurisdiction, and, as such, are usually threshold issues that must be decided before proceeding to the merits of a given case[.]" *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 415-16 (2d Cir. 2022) (citations omitted). But this is not absolute. Where, as here, "a jurisdictional issue is statutory in nature, [courts] are not required to follow a strict order of operations. . . ." *Id.* at 416 (citing cases). "Moreover, federal sovereign immunity differs from standard threshold matters of Article III jurisdiction in that it can be consented to or waived." *Id.* (citations omitted).

which Congress may prohibit in order to remedy or deter actual violations.'" *Id.* (quoting *Bolmer*, 594 F.3d at 146). "In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Nevada Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003).

As this Court explained in its June 14, 2023 Decision and Order, the Second Circuit previously held in *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn*, 280 F.3d 98, 111-12 (2d Cir. 2001), that Title II of the ADA only validly abrogates state sovereign immunity for monetary damages where there is discriminatory animus or ill will. (Dkt. 13 at 11). But the Supreme Court's subsequent decisions in *Tennessee v. Lane*, 541 U.S. 509 (2004), and *United States v. Georgia*, 546 U.S. 151 (2006) called *Garcia* into question.

In *Lane*, the Supreme Court held that the abrogation of sovereign immunity for Title II ADA claims was only valid in cases concerning courtroom accessibility. 541 U.S. at 533-34. In so holding, the Supreme Court explained that "in enacting Title II, Congress sought to enforce not only Equal Protection, but also 'a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review.'" *Bolmer*, 594 F.3d at 146-47 (quoting *Lane*, 541 U.S. 522-23). For instance, "[w]ith regard to courtroom accessibility, these guarantees included litigants' rights under the Due Process Clause of the Fourteenth Amendment." *Id.* at 147 (citing *Lane*, 541 U.S. at 523). "Thus, Title II was not wholly premised on discrimination against the disabled that violates the Equal Protection Clause." *Id.*

The Supreme Court in *Georgia* later held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." 546 U.S. at 159. But "*Georgia* explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment." *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 194 (2d Cir. 2015). It created a three-part test (the "*Georgia* test") to determine whether a plaintiff may sue a state for money damages under Title II of the ADA:

> [O]n a claim-by-claim basis, [the court must determine] (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Georgia*, 546 U.S. at 159.

In the absence of any clarification from the Second Circuit as to the extent, if any, *Garcia* survived after *Lane* and *Georgia*, district courts have adopted "varying approaches to the continuing validity of *Garcia*." *Matagrano v. N.Y. State Dep't of Corr. and Cmty. Supervision*, 9:19-CV-763 (BKS/DJS), 2023 WL 5932943, at *17 (N.D.N.Y. Sept. 12, 2023). Defendant relies in part and Plaintiff relies nearly entirely on the discriminatory animus/ill will test from *Garcia*. (Dkt. 48-7 at 9-13; Dkt. 53-1 at 17-18). However, without expressly disavowing that test, the Second Circuit recently held that "to determine whether

a Title II abrogation is valid," courts apply the *Georgia* test. *T.W.*, 110 F.4th at 82. The Court therefore utilizes *Georgia* as the operative test.

As discussed above, conduct that violates Title II of the ADA may abrogate state sovereign immunity where it also violates the Fourteenth Amendment. *See Georgia*, 546 U.S. at 159. "The Fourteenth Amendment incorporates the Eighth Amendment protection from cruel and unusual punishment." *Cosby v. Tawanna*, No. 3:19-CV-401 (MPS), 2019 WL 1921709, at *5 (D. Conn. Apr. 30, 2019) (citing *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463 (1947) (plurality opinion)).

Defendant argues that "Plaintiff's claimed deprivations are not constitutional in scope[,]" insofar as the Court has "already determined that Plaintiff did not state a claim under [the] Eighth Amendment for deliberate indifference[,]" and "[t]he record does not evidence another constitutional right implicated by [the] delay in the receipt of contact lenses." (Dkt. 48-7 at 12).

As the Court noted in its October 24, 2023 Decision and Order screening the complaint, Plaintiff had alleged that "Wyoming officials denied him the corrective lenses necessary to prevent the deterioration of his vision and the formation of cataracts." (Dkt. 7 at 7). While the Court determined that Plaintiff's alleged loss of vision to be a serious medical need, it concluded that the complaint failed to demonstrate the personal involvement of any of the individual defendants (DOCCS Medical Commissioner Dr. Koenigsmann, Wyoming Superintendent Sticht, or Dr. Grof ("Grof")) in the denial of contact lenses. (*Id.* at 7-9). As for Grof, who was alleged to have provided "inadequate"

treatment to Plaintiff at Wyoming, the Court concluded that "[e]ven drawing all inferences in Plaintiff's favor, as is required at this stage, there is no indication that Grof delayed Plaintiff's treatment or purposefully engaged in an ineffective course of treatment in order to delay his access to corrective lenses." (*Id.* at 9-10). Because Plaintiff offered "no additional facts [in the amended complaint] to establish [the individual defendants'] personal involvement or to support a claim of deliberate indifference with respect to the corrective lenses," Plaintiff's Eighth Amendment deliberate indifference claim was dismissed with prejudice. (Dkt. 13 at 8-9, 11 ("The amended complaint does not allege facts from which the Court can reasonably infer that DOCCS . . . acted with deliberate indifference to his disability in failing to replace his corrective lenses. . . .")).

With Plaintiff's Eighth Amendment deliberate indifference claims having been previously dismissed with prejudice, and Plaintiff having failed to argue that the conduct forming the basis of his ADA claim independently violated any other constitutional right, he has not demonstrated that the alleged ADA violation also violated the Fourteenth Amendment. *See Matagrano v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:19-CV-00763(BKS)(DJS), 2020 WL 7338586, at *17 (N.D.N.Y. Dec. 14, 2020) (turning to the third clause of the *Georgia* test where plaintiff's constitutional claims were either dismissed at screening or voluntarily and plaintiff did "not allege or argue that the conduct forming the basis of his ADA claim independently violate[d] any constitutional right").

In the absence of an ADA violation that also violates the Fourteenth Amendment, the Court must turn to the third clause of the *Georgia* test—whether "Congress's purported

abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Georgia*, 546 U.S. at 159. *See Colón v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 15 Civ. 7432 (NSR), 2017 WL 4157372, at *6 (S.D.N.Y. Sept. 15, 2017) ("If Plaintiff plausibly alleges violations of Title II (the first inquiry) that do not violate the Fourteenth Amendment (the second inquiry), then the Court must consider the third *Georgia* inquiry regarding abrogation of sovereign immunity.").

In determining whether Congress's purported abrogation of sovereign immunity is valid as to Plaintiff's claim, courts apply the following three-part test from *City of Boerne v. Flores*, 521 U.S. 507 (1997): (1) "identify with some precision the scope of the constitutional right at issue"; (2) determine "whether Congress identified a history and pattern of unconstitutional . . . discrimination by the States against the disabled"; and (3) consider whether "the remedy imposed by Congress must be congruent and proportional to the targeted violation." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 365-74 (2001). The Court addresses each step of this tripartite test. *See T.W.*, 110 F.4th at 82 (concluding that *Lane* did "not conclusively settle the first two prongs of the *City of Boerne* test for all classes of services" (citation omitted)).

"The first prong of the *City of Boerne* analysis requires [the court] to determine the scope of the constitutional right at issue." *T.W.*, 110 F.4th at 84. "In the prison context, Title II clearly implicates the Eighth Amendment and the equal protection rights of the Fourteenth Amendment." *Chase v. Baskerville*, 508 F. Supp. 2d 492, 499 (E.D. Va. 2007), *aff'd*, 305 F. App'x 135 (4th Cir. 2008).

"Under the second prong of the *City of Boerne* framework," the court considers "to what extent Title II was 'responsive to, or designed to prevent, unconstitutional behavior,' 'with respect to the particular services at issue in th[e] case[.]'" *T.W.*, 110 F.4th at 85 (original brackets omitted) (first quoting *City of Boerne*, 521 U.S. at 532, and then quoting *Lane*, 541 U.S. at 527). Among the conduct that Title II was "designed to address" is the "pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system[.]" *Lane*, 541 U.S. at 524-25; *see Thomas v. Kwarteng*, No. 2:22-CV-00163, at *5 (S.D. Tex. Apr. 27, 2023) (relying on *Lane* to find that the second step of the *City of Boerne* test is satisfied for a reasonable accommodation claim brought by an inmate), *report and recommendation adopted*, 2023 WL 4679005 (S.D. Tex. July 20, 2023).

Defendant focuses on the third step of the *City of Boerne* framework under which the court must determine "whether the rights and remedies created by Title II are congruent and proportional to the specific violations at issue given the nature of the constitutional right and the history of unconstitutional violations." *T.W.*, 110 F.4th at 87. It argues that "numerous district courts . . . have assessed Title II's remedies to be incongruent with the practical realities of accommodating disabilities in a prison environment" and "would also tread unnecessarily in an area where state officers' determinations and actions are given a measure of deference due to the high degree of state interest in a well-regulated prison system." (Dkt. 48-7 at 13 (citing *Lenti v. Connecticut*, No. 3:20-CV-127 (SRU), 2020 WL 4275600, at *10 (D. Conn. July 24, 2020)).

"Title II indiscriminately prohibits far more state conduct and in many more areas of prison administration than conceivably necessary to enforce any relevant constitutional rights[.]" *Phelan v. Thomas*, No. 9:10-CV-11 (GLS/DJS), 2017 WL 519246, at *5 (N.D.N.Y. Feb. 8, 2017) (internal quotation marks and citation omitted). Thus, "[n]umerous courts evaluating Title II ADA claims by state prisoners have found that the prisoners' claims fail the third step of the *City of Boerne* test because, in that context, Title II is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Lenti,* 2020 WL 4275600, at *10 (citation modified) (citing cases); *accord Torres v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 9:20-CV-0301 (MAD/TWD), 2024 WL 3498500, at *17 (N.D.N.Y. Mar. 13, 2024), *appeal withdrawn*, No. 24-1958, 2024 WL 5344155 (2d Cir. Oct. 24, 2024); *Matagrano,* 2023 WL 5932943, at *18; *see also Thomas*, 2023 WL 5166377, at *5 (finding the third step of the *City of Boerne* test not satisfied for a reasonable accommodation claim brought by an inmate because it was "far afield from the essence of the Eighth Amendment's prohibition against cruel and unusual punishment." (quoting *Lenti*, 2020 WL 4275600, at *10)), *Wilke v. Cole*, No. 12-CV-1231-JPS, 2014 WL 7237019, at *7 (E.D. Wis. Dec. 17, 2014) ("[I]n the context of state prisons, the Court finds that Title II's prophylactic demand for reasonable accommodation requires far more than does the Constitution. Title II's demand for modification or accommodation is not tailored to instances when the failure to do so will likely result in an actual constitutional violation." (internal citations omitted)), *aff'd*, 630 F. App'x 615 (7th Cir. 2015); *but see Cox v. Mass.*

*Dep't of Corr.*, No. CV 13-10379-FDS, 2018 WL 1586019, at *13 (D. Mass. Mar. 31, 2018) ("While th[e] requirements [of Title II of the ADA] will sometimes . . . exceed what is required under the Eighth Amendment, they are not 'so out of proportion to supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" (quoting *City of Boerne*, 521 U.S. at 532)).

As Defendant notes, Courts must also "be especially cautious before interfering with the administration of a State's prison system." *Lenti*, 2020 WL 4275600, at *10 (citing cases). Plaintiff offers no argument as to why the Court should depart from the numerous cases finding that prisoners' claims fail the third step of the *City of Boerne* test, and the Court sees no justification for doing so.

The Court therefore concludes that Plaintiff's claims for monetary damages under the ADA are barred by sovereign immunity and Defendant is entitled to summary judgment on this ground.[11]

[11] To the extent Plaintiff's claims are dismissed on sovereign immunity grounds, the dismissal is without prejudice. *See Cabell v. Doe*, No. 6:23-CV-06669 EAW, 2025 WL 1039285, at *4 (W.D.N.Y. Apr. 8, 2025) (discussing conflicting law on whether sovereign immunity dismissal is based on lack of subject matter jurisdiction).

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 48) is granted. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: September 1, 2026
Rochester, New York